### WATERS *v.* GILLIES.[1]

MORTGAGES — CONSIDERATION — CANCELLATION — EVIDENCE — REVIEW.

    Complainant traded real estate worth $5,000, incumbered by a mortgage of $4,000, with $485 unpaid interest and taxes, to defendant, for land worth $1,000.   The deed given by complainant excepted the mortgage, interest, and taxes from the

---

[1] Rehearing denied May 7, 1902.

warranty clause, but contained no express assumption of incumbrances by defendant. Complainant also gave defendant a mortgage for $485 on the property received from him, which recited that it was for a part of the purchase price. Complainant contended that this mortgage was given to secure defendant for the back taxes and interest, which he was to pay in the first instance; that he neglected to do so, and that complainant, having herself paid them, was entitled to a discharge of the mortgage; while defendant claimed that the mortgage was given for the purpose stated therein, and represented the difference between the value of complainant's equity and the value of the land deeded by defendant. On a consideration of all the evidence, *held,* that a preponderance was with the defendant.

Appeal from superior court of Grand Rapids; Newnham, J. Submitted October 8, 1901. Decided November 12, 1901.

Bill by Clarence F. Waters and Lillie A. Waters against Alexander R. Gillies to compel the discharge of a mortgage. From a decree for complainants, defendant appeals. Reversed.

*Taggart, Denison & Wilson,* for complainants.

*G. A. Wolf,* for defendant.

MOORE, J. Prior to February, 1898, Mrs. Waters, one of the complainants, was the owner of a lot and two houses in the city of Grand Rapids, upon which there was due and unpaid a mortgage for the principal sum of $4,000, and $485 of interest and back taxes. The defendant was the owner of two lots, which were unincumbered. Mrs. Waters, through her husband, the other complainant, who acted as her agent, placed this property with Mr. Griffiths, a real-estate agent, for sale or exchange. He had some talk with defendant about trading his two lots for the interest Mrs. Waters had in her property. Mr. Gillies, Mr. Griffiths, and Mr. Waters looked at the property of Mrs. Waters; and, after some negotiations, about which

the parties differ, on the 11th of February, 1898, Mrs. Waters made a warranty deed of her lot and two houses to Mr. Gillies, which deed, among other things, states:

"First party shall warrant and defend the same against all lawful claims whatsoever, except a certain mortgage of $4,000 and accrued interest thereon, recorded in L. 156, on p. 424, and also the taxes for the years 1895, 1896, and 1897."

There is no assumption of or agreement to pay any part of the incumbrance by second party in this deed. This deed was not recorded.

Upon the same date Mr. Gillies made to Mrs. Waters a warranty deed of the two lots, and she gave him a note reading as follows:

"$485.00.        GRAND RAPIDS, MICH., Feb. 11th, 1898.

"Three years after date I promise to pay to the order of A. R. Gillies four hundred and eighty-five dollars at the Fourth National Bank, value received, interest at seven per cent. per annum, payable semi-annually until paid.                                          LILLIE A. WATERS.

"Secured by real-estate mortgage."

—And a mortgage upon the two lots to secure the payment of this note; the mortgage stating, "This mortgage is given as part of the purchase price of the above premises."

On the following day Mr. and Mrs. Waters gave to Mr. Gillies a quitclaim deed of the lot and two houses; Mr. Gillies assigning, as a reason why he wanted it, that he wanted the signature of Mr. Waters to the conveyance giving him title. This deed was put upon record. Mr. Griffiths was paid a commission of $50 by Mrs. Waters. He received no compensation from the defendant. On the 11th of August, 1899, Mrs. Waters conveyed to Mr. Waters an undivided one-half interest to the property Mr. Gillies had deeded to her, "intending that the parties be tenants by the entirety."

After Mrs. Waters made the deed to Mr. Gillies, he put the property under the control of Mr. Griffiths, who

caused some repairs to be made to the premises, and collected the rent for Mr. Gillies, but paid nothing upon the mortgage or upon the back taxes. The $4,000 mortgage was owned by a bank, which commenced foreclosure proceedings June 22, 1898. Mr. Waters owned the mortgaged premises before his wife did, and signed the note and mortgage held by the bank. The bank, when it commenced foreclosure proceedings, notified Mr. Waters it would ask for a personal decree against him, and took such a decree November 3, 1898, in which a sale was authorized after June 9, 1899. The property was advertised to be sold August 12, 1899. On the 10th of August Mr. Waters caused $505 to be paid to the bank, the payment of which, he claims, entitled himself and Mrs. Waters to a discharge of the mortgage Mrs. Waters had given to Mr. Gillies; and, upon the latter's refusal to discharge the mortgage, the complainants filed this bill to obtain a discharge. Mr. Gillies answered to the bill, and filed a cross-bill asking for a foreclosure of the mortgage. The case was tried in open court. A decree was entered dismissing the cross-bill and canceling the mortgage. The case is appealed to this court by the defendant.

The testimony is very contradictory. The claim of the solicitors for complainants is:

"The decree in this case is right for two reasons:

"1. The consideration for the $485 mortgage was that Gillies was to take care of the back taxes and interest against the Crescent-avenue property to that amount, which Waters was primarily and personally bound to pay. Gillies failed to take care of the $485. On the other hand, Waters was obliged to, and did, pay the amount, with interest. Therefore the consideration for the mortgage has utterly failed. It would be inequitable to enforce it, and it should be discharged.

"2. Mr. Waters, having been obliged to pay the $485 which Gillies should have paid, is entitled, in equity, to set this off against the note and mortgage, and the mortgage should be discharged."

On the part of the defendant it is claimed that, while he took the property from Mrs. Waters subject to the

mortgage and back taxes, he did not assume them, and was under no obligation to pay them; that he did not agree to pay the $485, and such an agreement was not the consideration for the mortgage. He asserts that in the trade the parties valued Mrs. Waters' real estate at $5,000, upon which there were incumbrances, including the taxes, amounting to $4,485, leaving an equity in the property of $515; that his two lots were valued at $1,000, and after deducting from that amount the equity in the real estate of Mrs. Waters, $515, it left $485; that for his two lots she traded him her equity in her real estate, of $515, and gave him a mortgage back on his two lots, of $485, making the $1,000 at which his lots were valued in the trade. He insists the mortgage was given just as stated in the mortgage, as part of the purchase price of the premises.

Mrs. Waters and Mr. Gillies did not see each other or have any talk with each other in relation to the trade. The claim of complainants, so far as the record goes, is based upon the testimony of Mr. and Mrs. Waters. The former testified: "Mr. Griffiths came into the store the next morning and said that Mr. Gillies would not trade the property in that way unless the back taxes and interest were paid up. I told Mr. Griffiths that I could not pay him; that I did not have the money to take out of my business, and I could not pay the taxes and interest at that time, but that if he would pay them I would give him a mortgage back on these lots to secure him for the amount of the taxes and interest, provided Mrs. Waters was willing;" and that this was agreed to. He testified he had examined the record before giving his testimony, and found the quitclaim deed upon record, but the warranty deed was not recorded; that he read the warranty deed through before it was signed, and knew the difference between simply conveying subject to an incumbrance and assuming the incumbrance; and that there was a statement in the warranty deed that Mr. Gillies was to pay up

the taxes for 1895, 1896, and 1897, and the interest on the mortgage.

Mrs. Waters testified as to what occurred when the papers were brought to the house for her signature, in response to questions put to her, as follows:

"*Q.* What was the talk? What was said at that time between the three of you there about the back taxes and the interest on the hill property?

"*Mr. Wolf:* That is objected to as before,—as being incompetent, irrelevant, and immaterial.

"*A.* Mr. Griffiths explained to me as it was in the deed, —that they were to pay the 1895, 1896, and 1897 taxes and interest, and we were to give a mortgage on the south property for a guard for them.

"*Q.* As a guard for them?

"*A.* Yes, sir; because Mr. Waters did not feel able to spare the money, and rather than do it he would prefer to give a mortgage on the lots.

"*Q.* Do you remember how much, or about how much, those items figured up?

"*A.* About $485.

"*Q.* Who figured them up?

"*A.* I think they both figured them up together.

"*Q.* Mr. Waters and Mr. Griffiths?

"*A.* Yes, sir.

"*Q.* Can you say whether anything on that subject was put in the deed?

"*A.* It was; it was in the deed.

"*Q.* State as near as you can what was in the deed,— what the deed said about that.

"*A.* I don't know as I could do that.

"*Q.* Not the exact words, but the substance of it.

"*A.* I remember very emphatically, more than anything else but the interest, of seeing these figures on the deed at the last end of the deed.

"*Q.* '95, '96, and '97?

"*A.* Yes, sir; it was 1898 then, but the 1898 taxes were not due. Mr. Griffiths spoke of it.

"*Q.* But the exact language that was used there, you can't give?

"*A.* No, sir."

When the warranty deed was produced, it was evident the parties were mistaken as to what it contained.

Doubtless they were honestly mistaken, but it is a test of their recollection of what occurred. Mr. Griffiths and Mr. Gillies both testified that the mortgage was not given to indemnify Gillies for paying the back taxes and interest, but was given to make the equities in the two properties alike. Mr. Griffiths had been in the real-estate business some years, and was in the habit of drawing deeds and mortgages. As before stated, Mr. Waters knew the difference between accepting a deed subject to incumbrances and accepting one in which the grantee assumed the incumbrances. In view of these facts, it is difficult to account for the statement contained in the deed, if Mr. Gillies agreed to pay the interest and back taxes. If Mr. Gillies agreed to pay the $485 interest and back taxes, one would suppose the agreement would be put in the deed. Another significant fact, though not controlling, is that, some months after the mortgage was given, Mr. Griffiths, acting for Mr. Gillies, informed Mr. Waters that Mr. Gillies desired and expected to sell the mortgage, and, to enable him to do so, desired to borrow an abstract of the property which Mr. Waters had. Mr. Waters let him have the abstract. Other facts appear in the record which, though not important in themselves, taken in connection with the other testimony, lead us to conclude, from a perusal of the entire record, that complainants have failed to establish their case by a preponderance of evidence, and that the preponderance of the evidence is the other way.

The decree of the court below is reversed, and one will be entered here in accordance with the terms of the mortgage.

MONTGOMERY, C. J., HOOKER and LONG, JJ., concurred. GRANT, J., did not sit.